# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERTA J. HARRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:08CV21ERW/MLM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Roberta J. Harre ("Plaintiff") for Social Security benefits under Title II of the Social Security Act. Plaintiff has filed a brief in support of the Complaint. Doc. 12. Defendant has filed a brief in support of the Answer. Doc.14. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 4.

## I.
## PROCEDURAL HISTORY

On December 2, 2004, Plaintiff filed an application for disability benefits alleging a disability onset date of December 30, 2003. Tr. 45-47. Her claim was denied. Tr. 35-41. On September 13, 2006, a hearing was held before Administrative Law Judge ("ALJ") Robert G. O'Blinnis. Tr. 356. On September 22, 2006, the ALJ issued a decision finding that Plaintiff is not disabled. Tr. 14-22. On February 28, 2008, after consideration of additional evidence, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Tr. 5-7. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

A.     **Plaintiff's Testimony:**

Plaintiff testified that at the time of the hearing she was forty-six years old and was living with her husband; that she has a high school diploma; that she had gained twenty-five pounds due her hyperthyroidism; that she has training in design drafting; that she last worked as a janitor in a school, which job she held for one year; that she stopped working as a janitor in December 2003 because she was hurt at work; that prior to working as a janitor she stocked shelves at Walmart; that she also had worked as a school cook and performed assembly work at Toastmasters; that she worked at Toastmasters for seven years; and that she left her job at Toastmasters because of a car accident. Tr. 361-66, 373, 393.

Plaintiff further testified that she drives only short distances; that her sister drove her to the hearing; that she drives her grandson four blocks to school and picks him up after school; that after her grandson is at school she watches television; that she usually falls asleep for a couple of hours; that after making herself something to eat she lays back down and sleeps until she picks up her grandson; that she takes two or three naps a day; that she is awakened two or three times a night because of pain in her arms, legs or neck; that, when she tries to do dishes, the repetitive motion pulls on her arms and neck; that she does some laundry; that she sometimes makes the bed; that she uses a shower chair to shave her legs and wash her hair; that she does not vacuum or dust; that she hired a lady to clean and her niece helps her clean; that she had been bottle feeding a baby deer at her husband's farm for the three months prior to the hearing; that feeding the deer takes about two minutes; that her niece helps her feed the deer and shop; that she does not go out to eat and once in awhile drives through a fast food restaurant; that she has no hobbies; that she visits her parents once

2

or twice a week; that she does not take trips or garden; and that she turns on the water hose to water her two dogs. Tr. 362, 375-77, 381-83, 394-96.

Plaintiff said that the heaviest thing she lifts is a gallon of milk; that she has problems being on her feet; that she has trouble walking very far because her legs become weak; that she is not on a special diet or exercise plan; that she can sit twenty to thirty minutes without pain; that she can stand comfortably for twenty minutes; that she can walk only fifty yards without chest pain; that she cannot bend or stoop without pain; and that she has difficulty putting on her bra and bathing. Tr. 378, 384, 394-96.

Plaintiff also testified that she experiences numbness and tingling in her right hand; that this numbness and tingling shoots up to her neck; that her medications include Isorbide for her heart, Lysinopril for high blood pressure, Levothyroxine for her thyroid, Fusoremide for fluid retention, Torpol for high blood pressure, Zocor for cholesterol, Amitriptyline for pain, Neurontin for pain, and Nexium for her stomach; that her medicines sometimes make her dizzy; that this dizziness occurs once a day and lasts for ten minutes; that she smokes a pack of cigarettes a day; that her doctor has told her to stop smoking; that her doctors include Dr. Spaedy, whom she sees every six months, Dr. Gaines, Dr. Asher, with whom she no longer treats because he did not seem helpful, and Dr. Kahn, a neurologist who told her that there was nothing he could do for her neck pain because it was caused by arthritis; that for two months she had physical therapy after her work injury; that she had injections in her neck; that she saw three different doctors during her worker's compensation case; and that she has not seen an arthritis specialist. Tr. 367-71, 379-80, 384.

Plaintiff testified that she has chronic headaches which headaches last about eight to ten hours; that she takes a generic brand of Advil for the pain and uses cold and hot packs; that the headaches cause her to have nausea and vomit once or twice a week; that she is light sensitive with her

headaches; and that she has had the headaches since she suffered the work injury in December 2003. Tr. 387-88. Plaintiff further testified that physical exercise causes her to have chest pain; that she takes a nitro pill for chest pain; that when she walked 100 yards from her attorney's office to the hearing she had to take a nitro pill; that when she walks more than 100 yards her legs feel weak; that when she drives long distances her arms hurt; and that her legs cramp at night. Tr. 391-93.

**B.     Testimony of the Vocational Expert:**

Vocational Expert Brenda Young (the "VE") testified that Plaintiff's past work was mainly unskilled and ranged from sedentary to medium work. In particular, the VE testified that Plaintiff's past work in a retail stock position is unskilled light work; that her position as a factory laborer as she performed it is sedentary and unskilled; that her position as a school cook is classified at the lower end of the semiskilled range and is medium in work demand; and that her school janitorial position is light to medium and unskilled. The VE further testified that, assuming that Plaintiff can lift twenty pounds occasionally, ten pounds frequently, and can stand/or walk about six hours of an eight-hour workday, with the only caveat that she should avoid concentrated exposure to extreme cold or heat, Plaintiff can return to her past work in the retail stock and the factory laborer positions and, in some settings, the janitorial position. The VE testified that these job exist in significant numbers. Tr. 398-400. The VE also testified that if the exertional level is reduced to the sedentary level, all of Plaintiff's past jobs, with the exception of factory work as Plaintiff performed it, are precluded. The VE testified further that, at the sedentary level, there are other jobs which Plaintiff can perform, including some cashier jobs, and that there are about 800 such jobs in the St. Louis area. Tr. 401-402.

The VE said if it the limitations of no repetitive pushing, pulling or grasping with the right upper extremity were added, there would be no work which Plaintiff could perform. The VE also said

that chronic headaches requiring Plaintiff to take unscheduled breaks or a nap and absenteeism of more than two days a month would preclude Plaintiff's being employed. Tr. 402-403.

### III.
### MEDICAL RECORDS

January 30, 2004 records of Robert W. Gaines, M.D., of the Columbia Orthopaedic Group, reflect that Plaintiff reported that she hurt her shoulder a month earlier when she was pulling on some risers; that she was a custodian in a school; that "[a] couple of days after the injury, her shoulder started to be sore" and she sought chiropractic treatment with Dr. Allen; that there was "no specific tenderness around [Plaintiff's] shoulder at all and she [had] full range of motion of the shoulder joint"; that extension of Plaintiff's neck causes pain in her suprascapular area and infrascapular area; that Plaintiff had no trouble "reaching up"; that "rotation of her neck [was] fine"; that "the shoulder symptoms [] bothered [Plaintiff] when she extend[ed] her neck"; that there was "no tenderness in her shoulder at all"; that motor and sensory function in her upper extremities and grip were "fine"; that she had "some tingling in her hand"; that the pain was not "bitter [], rather just tingling occasionally"; that x-rays of Plaintiff's shoulder were normal; that Plaintiff's bone density was good; that the joint space in her shoulder was "fine"; that x-rays of Plaintiff's neck showed that "her 6-7 disc [was] degenerative and there [were] osteophytes on both levels"; that the neck x-rays also showed that Plaintiff's 5-6 disc was a "little bit narrow"; that "on flexion and extension films, all the discs open nicely and the foramina [were] open on the obliques as well"; that the impression was "probable mild cervical disc injury"; that Dr. Gaines "suggested a heating pad and some physical therapy"; that Plaintiff was to go to physical therapy twice a week for a month; that Plaintiff was to return in one month with a symptom diary; and that Plaintiff "may continue to work full time." Tr. 244.

Dr. Gaines reported on February 13, 2004, that Plaintiff described left-sided cervical radiculopathy with radiation into her subscapular area, interscapular area, and left arm; that in the

prior two weeks Plaintiff had these symptoms "only in the upper arm proximal to the elbow"; that on physical examination Plaintiff had "perfect range of motion," her rhythm was good, and she had no "Spurling's at all"; that Plaintiff had "lancinating cervical radiculopathy" the prior week; that Plaintiff was to have an MRI and continue physical therapy; and that Plaintiff was to stay "off work for another month." Tr. 246.

In an MRI report of March 2, 2004, James D. Wright, M.D., stated that the indications for the MRI were headache, left upper extremity radicular symptoms, cervicalgia, and cervical strain; that Plaintiff's test results showed an intact cervicomedullary junction, global spondolytic changes with disc dehydration, bulging and spurring, no tight central canal stenosis, no focal soft tissue disc protrusion, patent neuroforamina, and no evident neural impingement; and that the impression was "spondolytic changes without stenosis or disc protrusion" and sinusitis. Tr. 248

Dr. Gaines's records of March 2, 2004, state that Plaintiff "is not well, but she's some better"; that there was "a lot less pain in her left arm now, but she still has pain at the base of the neck and shoulder somewhat"; that on examination Plaintiff had "absolutely full range of motion [] in her neck and hyperextension does not cause any radiculopathy at all"; that a new MRI showed "disc degeneration which [was] obvious at 6-7 and a little bulge at 5-6"; that Plaintiff slept "fairly well through the night, but [] wake[s] up once with pain in her neck"; that Plaintiff was continuing to be off work; that he thought Plaintiff was making progress; that Plaintiff should remain off from work for another six weeks; and that Plaintiff was prescribed Tylenol #3. Dr. Gaines's records of this date further state that, "I'll see [Plaintiff] any time if things really get intolerable. I'll bet this is going to burn out by itself." Tr. 247.

On July 3, 2004, Maxwell Lazinger, M.D., of Boone Hospital Center, Department of Radiology, reported that Plaintiff had two chest views; that the heart and mediastinum were normal

size; that there was no infiltrate, effusion or pneumothorax; and that the impression was "no acute pathology." Tr. 253.

Tony J. Spaedy, M.D., reported that Plaintiff had a cardiac catheterization on July 5, 2004; that the indication for the procedure was "recurrent prominent chest discomfort with evidence of anteroseptal/anteroapical myocardial infarction"; and that the impression included large area of anteroapical and distal inferior hypokinesis to akiinesis, no significant mitral insufficiency, normal left main coronary artery, diffuse spasm in the left anterior descending system which improved significantly with intracoronary nitroglycerin, small and codominant right coronary artery, and "no obstructive disease at any site." Tr. 254-55.

Dr. Spaedy's records of August 17, 2004, state that Plaintiff was "doing fairly well except she still [had] a lot of chest discomfort" at rest and with exertion; that Plaintiff did not feel well in general; that Plaintiff had not "started a rehab program yet"; that physical examination showed Plaintiff weighed 200 pounds, that her blood pressure was 126/96, and that her throat and chest were clear; that a cardiovascular exam "reveal[ed] a regular rhythm with normal first and second heart tones"; that there was no murmur or gallop; that Plaintiff's extremities were without tenderness or edema; and that the impression was previous anterior apical infarction, a long history of tobacco use, and hypertension. Dr. Spaedy reported on this date that Plaintiff had previous anterior apical infarction with an ejection fraction of forty percent and that the plan was for Plaintiff to take a higher dose of Imdur and to start cardiac rehab. Tr. 256.

Dr. Spaedy reported on September 1, 2004, that Plaintiff said that she had chest pain the prior night; that nitro "seem[ed] to help her discomforts fairly promptly"; that she no longer smoked; that "overall she fe[lt] like she [was] doing better"; that she was "tolerating her current medications"; that "a lot of her discomfort [was] also helped with sublingual nitroglycerin"; and that she had "moderate

dyspnea." Dr. Spaedy's notes of this date state that physical examination showed that Plaintiff weighed 207 pounds, that her blood pressure was 142/90, that her HEENT revealed clear sclerae, and that her throat and chest were clear; that a cardiovascular exam revealed "a slightly tachycardiac resting heart rate, that her impulses were hyperdynamic, and that there was no murmur or gallop; that Plaintiff's extremities were without tenderness or edema; that the impression on this date was previous anterior apical infarction, a long history of tobacco use, and hypertension; and that the plan included increasing Plaintiff's dose of Toprol and Plaintiff's returning in three to four weeks. Tr. 257.

John B. Baird, M.D., reported on September 1, 2004, that the impression from a stress test was that Plaintiff had limited exercise tolerance with attainment of target heart rate; that there were borderline ST segment changes inferolaterally with stress; and that there was 4/10 chest discomfort with stress radiating to the left arm. Dr. Baird also reported on this date the impression from a nuclear medicine scan was "mildly abnormal exercise gated sestamibi myocardial perfusion scan test with small, reversible perfusion defect ... with normal wall motion of the left ventricle." Tr. 258.

Dr. Spaedy reported on September 22, 2004, that Plaintiff was "doing well" and "denie[d] increase in her discomfort"; that Plaintiff's breathing was stable; that Imdur "clearly seem[ed] to help"; that Plaintiff reported "no palpitations or trouble with her medicines"; that Plaintiff weighed 208 pounds and her blood pressure was 120/80; that a cardiovascular exam revealed a regular rhythm with normal first and second heart tones; that there was no murmur or gallop; that Plaintiff's extremities were without tenderness or edema; and that the plan was for Plaintiff to continue her current medications and return in two months. Tr. 259.

Dr. Spaedy's records of October 18, 2004, reflect that Plaintiff "call[ed] over the weekend"; that Plaintiff continued to have prominent symptoms of angina; that Plaintiff had a "significant response to nitrate"; and that a repeat angiography was to be scheduled. Tr. 262.

Dr. Spaedy's records of October 25, 2004, reflect that Plaintiff underwent a cardiac catheterization on this date. Dr. Spaedy reported that his findings included normal LV systolic function with an ejection fraction of sixty percent, no significant mitral insufficiency, normal left main coronary artery, co-dominant circumflex system, luminal irregularities, no obstructive disease at any site, and co-dominant circumflex free of significant disease. Dr. Spaedy further reported on this date that the right coronary artery had luminal irregularities in its proximal segment and was otherwise free of disease and "relatively small." Tr. 263.

Haw Chou Lee, M.D., of the Columbia Orthopaedic Group, reported that Plaintiff was seen on December 16, 2004; that she was "back after nine months"; that Plaintiff had been seeing "lots of physical therapists and doctors"; that she was "released from Workmen's Compensation and told they cannot do anything for her"; that Plaintiff complained of frequent neck pains with radiation down to both hands, left more than right; that Plaintiff reported having acute myocardial attack three months prior and that she was told by a doctor that "the condition did not warrant any surgeries or angioplasty"; that a note stated that a May 26, 2004 CT/myelogram did not reveal any obvious myelopathy of the cervical spine or any acute disc herniation of any type associated with foraminal narrowing"; that Plaintiff did not "feel any subjective weakness or sensory change over the lower limbs"; that Plaintiff had good coordination; and that Plaintiff did not have any problems with "any trunk shift or walking." Dr. Lee further reported that physical examination showed Plaintiff had good rhythm over her neck; that she was "able to flex to about 80 and extend to about 20"; that lateral and external rotation were normal; that over her lower back Plaintiff was "able to bend to about 90 degrees and extend to about 20 degrees"; and that Plaintiff had good rhythm in her trunk. Dr. Lee's notes of this date also state that a neurological examination of the upper and lower limbs revealed full power; that reflexes were diminished in both upper and lower limbs; and that Plaintiff had intact

sensation and tone of muscles. Dr. Lee reported that Dr. Gaines thought Plaintiff's problems were angina and cervical degenerative disc disease; that Dr. Gaines advised Plaintiff to use a cervical collar, a Philadelphia collar, and home traction; and that Plaintiff should return in six weeks. Tr. 249-50.

Dr. Spaedy's records of January 25, 2005, state that Plaintiff had been having pain in the anterior part of her right leg, occasional brief chest discomfort, and moderate dyspnea with activity; that Plaintiff weighed 226 pounds; that she continued to smoke; that her blood pressure was 116/74; that a cardiovascular examination revealed a regular rhythm with normal first and second heart tones; that there was no murmur or gallop; that Plaintiff's extremities were without tenderness or edema; that Plaintiff had a history of ischemic heart disease, a long history of tobacco use, hypertension, obesity, and hyperlipidemia; that the plan was for Plaintiff to stay with her current medications; that Plaintiff was encouraged to cease smoking, to lose weight, and to exercise regularly; that Plaintiff's cardiac status was stable; and that Plaintiff was to see a neurologist "given the paresthesias in her legs." Tr. 265.

In a Physical Residual Functional Capacity ("RFC") Assessment dated February 14, 2005, R. Stoecker reported that Plaintiff can occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for about six hours in an eight-hour workday, and sit with normal breaks for about six hours in an eight-hour workday, and that Plaintiff's ability to push and/or pull is unlimited. Also, no postural manipulative, visual, or communicative limitations were found in this RFC Assessment. It was noted that Plaintiff should avoid exposure to extreme cold and heat. Tr. 266-71.

Irving Asher, M.D., of Neurology Inc., stated in a consultation report dated March 28, 2005, that Plaintiff presented, pursuant to a referral from Dr. Spaedy, for evaluation of leg pain; that a physical exam showed Plaintiff's blood pressure was 142/82; that she weighed 225 pounds; that she

was awake, alert, oriented, and intellectually intact; that her cranial nerves were completely intact; that her strength and tone were normal and symmetric; that there was diminished sensation to pinprick in the index finger and thumb distally and to the inguinal region circumferentially on the right; that her casual gait was normal; that straight leg raising elicited minimal discomfort at ninety degrees; that the range of motion in her neck was normal; that Plaintiff complained "of right lower extremity pain, currently unclear etiology"; and that studies were to be obtained. Tr. 303-304.

On May 9, 2005, Dr. Asher reported that Plaintiff complained of "ice pick pain in her temples," nausea, vomiting, and blurred vision; that Plaintiff was convinced that her headaches were "those that she might have from an aneurysm"; that her neurologic exam was normal; that her eye grounds were normal; that "there [was] a hysteric quality to" Plaintiff; that she might have migraine; and that he would obtain an MRI scan of Plaintiff's head. Tr. 305.

In a report dated May 9, 2005, Dr. Asher stated that an MRI showed that vertebral bodies were normally aligned, vertebral bodes heights and disc spaces were well maintained, no significant disc bulge was present, neural foramina were maintained, and no spinal canal compromise was apparent. Dr. Asher's impression on this date was a normal lumbar spine. Tr. 308-309.

Dr. Asher reported that a June 6, 2005 MRI of Plaintiff's brain showed that the ventricular system and cortical sulci were intact; that midline brainstem structures, sinuses, and pituitary fossa were normal; and that a single bright punctate white matter lesion was noted in the right frontal region. Tr. 313.

Jane I. Samuels, R.N.,B.C., F.N.P., of Neurology Inc., stated in a June 6, 2005 consultation report that Dr. Asher conducted an MRI/MRA to rule out an aneurysm; that these tests both were normal; that Plaintiff had been prescribed amitriptyline for her headaches; that she "did not start on the amitriptyline because she lost the prescription but she did not think to call us"; that Plaintiff

continued to have daily headaches and neck pain; that physical exam showed Plaintiff's cranial nerves were intact, her range of motion in her neck was intact, "although she state[d] it pulls and [was] tender, her strength was good bilaterally in her upper extremities, and she had no numbness with movement; that Plaintiff was reassured that there was no sign of brain tumor, aneurysm, stroke or other abnormalities; that Plaintiff was told to start amitriptyline "as it [would] help with both with the neck and the headache she [was] having"; and that Plaintiff was to return in three months. Tr. 311.

Dr. Spaedy reported on July 26, 2005, that Plaintiff continued to smoke; that her angina improved with nitroglycerin; that Plaintiff was not very active; that a cardiovascular examination revealed a regular rhythm with normal first and second heart tones; that there was no murmur or gallop; that Plaintiff's extremities were without tenderness; and that Plaintiff was encouraged to avoid tobacco and "work on regular exercise." Tr. 327.

Iqbal Kahn, M.D., reported on August 23, 2005, that Plaintiff presented complaining of arm and neck pain; that she sustained an injury while at work in December 2003; that since that time she continued to complain of pain in the neck, arms, low back and headache; that Plaintiff had a workman's compensation claim which was "decided with partial permanent disability"; that Plaintiff had full range of motion of the neck; that she had no discomfort turning the neck side to side; that an extremity examination was unremarkable; that a "cranial nerve examination II-XII" was unremarkable; that Plaintiff's motor strength was 5/5 in all four extremities with normal tone and bulk; that she was "grossly areflexic"; that "sensation [was] intact to pinprick and light touch except for the right hand with diminished pinprick sensation in the 1st, 2nd, and 3rd digit, and on the left hand where she has impaired pinprick sensation in all the digits"; that the cerebellar sign was negative; and that her gait was unremarkable. Tr. 319-20.

In a September 7, 2005 report, Dr. Khan stated that a nerve conduction study of Plaintiff's upper extremities and an EMG were normal. Tr. 323.

In a September 9, 2005 x-ray report, Alan E. Hillard, M.D., stated that "central canal narrowing [was] seen at C4-5, C5-6, C6-C7, with degenerated discs present"; that there were "no focal disc protrusions identified, with asymmetric disc to the right at C5-6"; and that neural foramina were not well seen. Tr. 324.

Dr. Khan reported on October 4, 2005, that Plaintiff's "symptoms remained the same, however, examination reveal[ed] that the sensory impairment on the fingertips noted previously [were] inconsistent"; that an MRI of Plaintiff's brain had been normal; that an MRI of Plaintiff's lumbar spine had been normal; that an MRI of the C-spine showed spondylitic changes without stenosis or disc protrusion; that Plaintiff's nerve conduction was unremarkable; that Plaintiff's symptoms were related to arthritis and degenerative disease; that there was no evidence of radiculopathy; and that it was Dr. Khan's recommendation that Plaintiff follow-up with Dr. Asher. Tr. 321.

Dr. Spaedy reported on January 31, 2006, that Plaintiff weighed 216 1/2 pounds; that her chest was clear; that a cardiovascular examination revealed a regular rhythm with normal first and second heart tones; that there was no murmur or gallop; that Plaintiff's extremities were without tenderness or edema; that Plaintiff was encouraged to stop smoking; and that Dr. Spaedy planned to see Plaintiff annually. Tr. 328

Nurse Practitioner Samuels reported that Plaintiff was seen on January 31, 2006, for a follow-up visit; that Plaintiff had last seen Dr. Asher in June 2005; that Plaintiff had "chronic daily headaches and [ ] right leg complaints"; that she had missed her September 2005 appointment with Dr. Asher; that Plaintiff's blood pressure was 134/94, "but she did not take her medications [that] morning"; that

Plaintiff's strength was good bilaterally; that sensation was intact to light touch; that Plaintiff guarded "the right leg a little bit, but is able to maintain muscle tone and keep it raised to pressure"; that Plaintiff's heart was regular; that her neck was extremely tight and her muscles were tight and tender; that Plaintiff's range of motion was intact, "but it pulls and causes discomfort with lateral end flexion; that her gait was intact; that she had poor "DTRs throughout"; and that Plaintiff was to keep a "better record of her headaches" and encouraged to use amitriptyline. Tr. 314-15.

Laura J. Sievert, M.D., of the Boone Hospital Center Department of Radiology, reported on February 27, 2006, that test results were consistent with hyperthyroidism; that this condition would be amenable to radioactive iodide treatment; and that Dr. Spaedy was to perform this procedure that day. Tr. 293.

Dr. Sievert reported on February 28, 2006, that Plaintiff underwent "I-131 treatment for hyperthyroidism"; that she was on a beta-blocker; and that she was to see Dr. Spaedy for follow-up. Tr. 295.

Records of the Clarence Medical Clinic dated March 8, 2006, state that Plaintiff's weight was 216 pounds; that her blood pressure was 160/102; that Plaintiff's chest was clear; that her extremities were 5/5; that her skin was tanned, warm and sweaty; and that the impression included rectal bleeding, diarrhea, tachycardia, and thyroid disfunction. Tr. 277.

Dr. Spaedy reported on March 28, 2006, that Plaintiff weighed 218 pounds; that her blood pressure was 120/80; that her chest was clear; that a cardiovascular examination revealed a regular rhythm with normal first and second heart tones; that there was no murmur or gallop; and that Plaintiff's extremities were without tenderness or edema. Tr. 329.

Dr. Asher reported on June 19, 2006, that Plaintiff continued to complain of chronic headaches; that Plaintiff was cognitively intact; that she was not in any acute distress; that she had

a normal cranial nerve exam; that she had "normal tone and strength though out"; that she had intact sensation to pinprick; that she had "decreased sensation to pinprick in the median nerve distribution, but normal elsewhere"; that she had some tenderness to percussion over the mid-dorsal region of her back; and that her straight leg raising was negative. After reviewing Plaintiff's history, Dr. Asher stated in his June 19, 2006 report that, "I am beginning to suspect that I am not going to be able to help this woman with her chronic complaints. I am going to check a sed rate and CPK, repeat an MRI of her C-spine and obtain an MR of her thoracic spine." Dr. Asher further stated that "if nothing shows up on [Plaintiff's] current studies, it may be worth referring [Plaintiff] to pain clinic." Tr. 316-17.

A June 27, 2006 radiology report prepared by Dr. Asher states that an MRI of the cervical spine showed "evidence of a very straight cervical spine," "maintained vertebral body heights and disc spaces," no evidence of cervical canal stenosis, a broad-based disc bulge at C6-7, no significant cord impingement, and no cord parenchymal changes. Dr. Asher reported that his impression was "abnormal MR cervical spine with marked straightening of the cervical spine and broad-based disc bulge at C6-7." Tr. 298-99.

A June 27, 2006 radiology report prepared by Dr. Asher states that an MRI of the thoracic spine showed normal alignment of vertebral bodies, "maintained vertebral body heights and disc spaces," no cord parenchymal abnormalities, no evidence of significant disc bulges, and no cord parenchymal abnormalities. Dr. Asher's impression was that there were "no significant abnormalities." Tr. 300-301.

Dr. Spaedy reported on June 30, 2006, that Plaintiff weighed 232 pounds; that her blood pressure was 138/90; that a cardiovascular exam revealed a regular rhythm with normal first and second heart tomes; that there was no murmur or gallop; that Plaintiff's extremities were without

tenderness or edema; that Plaintiff was encouraged to cease smoking; that Plaintiff's thyroid function "looked good"; and that Plaintiff was to return in six months. Tr. 331.

Dr. Spaedy also reported on June 30, 2006, that a resting EKG "indicated ST depression"; that an "electrocardiogram [was] inconclusive for ischemia"; and that "no arrhythmias occurred during infusion or recovery." Tr. 342. On this same date Dr. Spaedy reported that the results of a nuclear medicine scan were as follows: "a small nontransmural myocardial infarct involving the apex," normal left ventricular wall thickening, and normal left ventricular size and systolic function. Dr. Spaedy further reported that compared with images of September 1, 2004, there was a "significant change in so far as the previously seen reversible defect in the anterior wall is no longer seen." Tr. 343.

Records of the Clarence Medical Clinic reflect that Plaintiff presented on July 11, 2006, and that the impression on this date was that Plaintiff was a "well woman." Tr. 279.

Dr. Gaines reported that Plaintiff was seen on August 2, 2006; that Plaintiff was back to see this doctor "because her husband was disappointed with Dr. Asher's reaction"; that on exam Plaintiff could "almost touch her toes"; that Plaintiff had a "normal neurologic exam throughout"; that Plaintiff's "uppers and lowers and pulses were good"; that Plaintiff could "jump up and down"; and that Plaintiff said her disability application was still pending. Tr. 351.

On September 21, 2006, Dr. Gaines reported that Plaintiff was seen on this date; that her complaints were "very nonspecific"; that her "complaints were mainly just numbness at the tips of her index fingers but not pain today at all"; that Plaintiff had "negative Spurling's and no weakness at all"; that a June 2006 MRI showed a "tiny bulge at C4-5 and C6-7 but certainly not cervical pathology"; and that her complaints were "vaporous." Tr. 350.

## IV.
## LEGAL STANDARDS

16

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual

functional capacity and the physical and mental demands of the work the claimant has done in the past.  20 C.F.R. §§ 404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC.  Young, 221 F.3d at 1069 n.5.  If the claimant meets these standards, the ALJ will find the claimant to be disabled.  "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id.  See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden  of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence.  Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).  In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or  deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ.& Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421

F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ erred in assessing her allegations of pain and her credibility pursuant to the Polaski factors and that the ALJ erred "when he ignored the VE's testimony that Plaintiff would be unemployable if she could do no more than repetitive pushing, pulling or grasping

with her dominant right upper extremity, or if she would be absent from work on an average of two or more days a month ... or if she needed more than normal breaks."

## A.   Plaintiff's Complaints of Pain:

As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Guillams, 393 F.3d at 801; Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as also more fully set forth above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d273, 275 (8th Cir. 1995).  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F. 3d 963, 966 (8th Cir. 1996).  In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered that Plaintiff testified that she can drive only short distances; that she is able to feed, dress, and bathe herself "but that she relied on family members or hired help to assist her with most household chores and with grocery shopping"; and that she spends a typical day at home sleeping or watching television. Tr. 16. The ALJ also considered that "to the extent [Plaintiff's] daily activities are restricted, they are restricted much more so by her choice than by any apparent medical proscription." Tr. 20. The court notes that Plaintiff also testified that she drives her grandson to school and picks him up after school; that she makes herself something to eat; that she does some laundry, sometimes makes the bed, and bottle feeds deer. While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792 (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen, 75 F.3d at 439-31 (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). An ALJ, however, is not required to believe all of a claimant's assertions concerning her daily activities. Johnson v. Chater, 87

F.3d 1015, 1018 (8th Cir. 1996). "[S]ubjective complaints of pain cannot be disregarded solely because there is no supporting medical evidence, but they can be discounted if the ALJ finds inconsistencies in the record as a whole." Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (citing Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997)). A record, such as that in the matter under consideration, which does not reflect physician imposed restrictions suggests that a claimant's restrictions in daily activities are self-imposed rather than by medical necessity. See Zeiler, 384 F.3d at 936 ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day."); Fredrickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily."). The court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit her complaints of debilitating pain. The court further finds that substantial evidence supports the ALJ's decision in this regard.

Second, the ALJ considered that Plaintiff received worker's compensation related to a December 2003 work accident; that this evidence is entitled to some weight; and that Plaintiff's receiving worker's compensation does not prove disability because the SSA operates under different statutes, regulations, rules and guidelines than those applied by other governmental agencies. Tr. 16. Findings of disability by state agencies, even though they are not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision. Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). See also Wilkins v. Callahan, 127 F.3d 1260, 1262 (10th Cir. 1997); Baca v. Department of Health and Human Services, 5 F.3d 476, 480 (10th Cir. 1993); Fowler v. Califano, 596 F.2d 600, 603 (3d Cir. 1979). However, an "ALJ is not bound by the disability rating of another agency when he is evaluating whether the claimant is disabled for purposes of social security benefits, 20 C.F.R. § 404.1504." Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006) (quoting Fisher v. Shalala, 41 F.3d

1261, 1262 (8th Cir. 1994) (per curiam) ("There is no support for [the claimant]'s contention that his sixty-percent service-connected disability rating equates with an inability to engage in any substantial gainful activity under social security standards."). In the matter under consideration, the ALJ considered and discussed the State agency finding that Plaintiff was entitled to worker's compensation although he found it was not controlling. Only after considering the underlying medical evidence and the applicable Social Security Regulations did the ALJ find that Plaintiff is not disabled. The court finds, therefore, that the ALJ properly considered that Plaintiff received worker's compensation. The court further finds that the ALJ's decision in regard to Plaintiff's receiving worker's compensation benefits is supported by substantial evidence.

Third, the ALJ considered that Plaintiff had a "scattered and somewhat erratic work record," with fair earnings in some years but little or no earnings in others, and that her best earning years were from 1986 to 1991. Indeed, an ALJ may discount a claimant's credibility based upon her poor work record. Ownbey v. Sullivan, 5 F.3d 342, 345 (8th Cir. 1993). See also Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The court finds, therefore, that the ALJ properly considered Plaintiff's work record and that his decision in this regard is supported by substantial evidence.

Fourth, the ALJ found that the objective medical evidence on the record as a whole did not support a finding of disability. In particular, the ALJ considered that Plaintiff had a history of hypertension; that she had a history of right ear canal damage which resulted in no long term limitations; that an x-ray of Plaintiff's cervical spine in January 2003 showed only some mild disc disease at C6-7; that Dr. Gaines described only some mild cervical disc injury; that Plaintiff underwent physical therapy in 2004; that at the conclusion of physical therapy Plaintiff's return to work was limited only by her subjective pain complaints; that the physical therapist reported that Plaintiff had no more than a *five*

*percent whole body impairment* and suggested life style changes including smoking cessation and adhering to a better diet; that Dr. Haupt reported in June 2004 that there was *no real objective pathology* for Plaintiff's left shoulder pain and that Plaintiff probably had myofascial pain syndrome for which nothing could be done orthopedically; that Dr. Bernardi reported in September 2004 that Plaintiff had no musculoskeletal injury that was disabling; that Plaintiff underwent a cardiac catheterization in July 2004 after she was found to have had an anterior apical infarction; that it showed mild coronary artery disease at 3-4 vessels with a 30-50% stenosis; that *no significant limitations* were placed on Plaintiff from a cardiovascular standpoint although Plaintiff was told to watch her diet and exercise; that a treadmill test and nuclear medicine scan of September 2004 showed only a small *reversible perfusion defect*; that on September 24, 2004, it was reported that Plaintiff was *doing well* and that her blood pressure was normal; that a repeat cardiac catheterization on October 25, 2004, showed the same results as the earlier one; that on January 25, 2005, Plaintiff's *cardiac status was normal*; that Dr. Cantrell, a specialist in physical medicine, reported in November 2004 that Plaintiff was capable of resuming her regular duty activities and that he reported in December 2004 that she had "only a 5% worker's compensation rating; that despite Plaintiff's complaint of pain in her legs, especially her left leg, *studies* of Plaintiff's lower right extremity in May 2005 were *negative*; that a May 2005 *MRI* of the lumbosacral spine was *negative*; that a June 2005 *MRI of the brain* was *negative*; that a colonoscopy of May 2006 showed only *benign polyps*; that Plaintiff's *heart condition was stable* as of March 2006; that in June 2006 Plaintiff told Dr. Asher that she *no longer had right leg pain* although she said she still had headaches, neck pain, and upper extremity pain; that June 2006 MRI showed no new signs in the cervical spine and a June 2006 *MRI* of the thoracic spine was *negative*; that in June 2006 a *stress test and nuclear medicine scan* showed that the reversible *defect* found in September

2004 was *no longer present*; and that a June 2006 EKG showed only *insignificant ST wave changes* and *no arthymias or anything conclusive for ischemia.*

A lack of objective medical evidence detracts from Plaintiff's subjective complaints. While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996), the absence of an objective medical basis to support the degree of Plaintiff's subjective complaints is an important factor in evaluating the credibility of the testimony and the complaints. See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991); Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987). The court finds, therefore, that the ALJ properly considered the medical evidence of record upon finding that Plaintiff is not disabled and that his decision in this regard is supported by substantial evidence.

Fifth, the ALJ considered that Plaintiff was repeatedly told to stop smoking; that she failed to do so; that a physical therapist reported suggested life style changes for Plaintiff including smoking cessation and adhering to a better diet; and that Plaintiff continued to gain weight. The ALJ also considered that Plaintiff missed a September 2005 appointment with Dr. Asher; that she did not visit this doctor again until January 2006; and that Dr. Asher's nurse reported in January 2006 that, although Plaintiff complained of severe headaches, it was not clear if she was taking the medication prescribed for her headaches. Plaintiff acknowledges in her Brief in Support of Complaint that she weighed 200 pounds in August 2004 and 232 pounds in June 2006 and that despite recommendations from doctors that she stop smoking, she failed to do so. A lack of desire to improve one's ailments by failing to follow suggested medical advice detracts from a claimant's credibility. Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989) (holding that the ALJ can discredit subjective complaints of pain based on claimant's failure to follow prescribed course of treatment); Weber v. Harris, 640 F.2d 176, 178 (8th

Cir. 1981). See also Eichelberger, 390 F.3d at 589) (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments and that no physician imposed any work-related restrictions on her) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain). The court finds, therefore, that the ALJ properly considered Plaintiff's non-compliance with medical advice and that the ALJ's decision in this regard is supported by substantial evidence.

Sixth, the ALJ considered that no doctor who treated or examined Plaintiff ever stated or implied that she is disabled or totally incapacitated and that no doctor has placed any long-term limitations on Plaintiff's abilities to do basic exertional activities beyond "those the vocational expert was asked by the [ALJ] to assume in determining [Plaintiff's] employability." Indeed, as stated above, Dr. Speady reported that Plaintiff's mild coronary artery disease was not significantly limiting and Dr. Cantrell reported that Plaintiff had the capacity for at least light work. A record which contains no physician opinion of disability detracts from claimant's subjective complaints. See Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981). The court finds, therefore, that the ALJ properly considered the absence of a finding by any doctor that Plaintiff is unable to work and that the ALJ's decision in this regard is supported by substantial evidence.

Seventh, the ALJ considered that Plaintiff had no surgery or inpatient hospitalizations, "at least not in recent years"; that she had physical therapy, which lasted about two months; that she does not take strong doses of medication; that there was no documentation of significant or uncontrollable adverse side effects from the medications which Plaintiff does take; and that in instances where Plaintiff had side effects from medication these side effects were eliminated or "at least greatly diminished by

simple changes in either the type of medication or the size and/or frequencies of the dosages." Tr. 19-20. Conditions which can be controlled by treatment are not disabling. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling);Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. Additionally, pursuant to Polaski, 730 F.2d at 1322, the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). Where a plaintiff has not been prescribed any potent pain medication, an ALJ may properly discount the plaintiff's complaints of disabling pain. Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994); Riggins, 177 F.3d at 693; Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994); Benskin, 830 F.2d at 884 (holding that treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain); Cruse 867 F.2d at 1187 (holding that minimal consumption of pain medication reveals a lack of disabling pain); Rautio, 862 F. 2d at 179 (failure to seek aggressive treatment is not suggestive of disabling pain). The court finds, therefore, that the ALJ properly considered Plaintiff's medications and hospitalizations and/or the lack thereof, and the side effects of Plaintiff's medications and further finds that substantial evidence supports the ALJ's conclusions in regard to these considerations.

For the reasons articulated above, the court finds that the ALJ did not err in considering Plaintiff's allegations of pain; that the ALJ properly considered Plaintiff's allegations of pain pursuant to Polaski; and that the ALJ's decision in regard to Plaintiff's allegations of pain is supported by substantial evidence.

**B.      Vocational Expert Testimony:**

Plaintiff contends that the ALJ erred because he ignored testimony by the VE that Plaintiff would be unable to work if she could not engage in repetitive pushing, pulling or grasping with her dominant right upper extremity, or if she would be absent from work on an average of two or more days a month because of medical problems or if she needed more than normal rest breaks. The court will first consider the Regulations and case law applicable to Plaintiff's allegations in this regard.

20 C.F.R. § 404.1520, which sets forth the sequential analysis applicable to a claim of disability states:

> (e) When your impairment(s) does not meet or equal a listed impairment. If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record, as explained in § 404.1545. (See paragraph (g)(2) of this section and § 404.1562 for an exception to this rule.) We use our residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work (paragraph (f) of this section) and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if you can adjust to other work (paragraph (g) of this section).

> (f) Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment, which we made under paragraph (e) of this section, with the physical and mental demands of your past relevant work. (See § 404.1560(b).) If you can still do this kind of work, we will find that you are not disabled.

Further, 20 C.F.R. § 404.1560 states, in relevant part, in regard to a claimant's ability to perform past relevant work:

> (b) Past relevant work ...

> (2) Determining whether you can do your past relevant work. We will ask you for information about work you have done in the past. We may also ask other people who know about your work. (See § 404.1565(b).) We may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. *A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge*

*concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy.* Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, *a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.*

(3) If you can do your past relevant work. If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.

(c) Other work.

(1) If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

(emphasis added).

Indeed, "[a]t step four of the sequential analysis an ALJ must consider whether a claimant's impairments keep [her] from doing past relevant work. The ALJ evaluates a claimant's ability to do past relevant work based on a review of the claimant's residual functional capacity and the physical and mental demands of his past work." <u>Evans v. Shalala</u>, 21 F.3d 832 (8th Cir. 1994) (citing <u>Kirby v. Sullivan</u>, 923 F.2d 1323, 1327 (8th Cir.1991)).

Additionally, upon posing a hypothetical to a VE an ALJ is not required to include all of a claimant's limitations, but only those which he finds credible. <u>Gilbert v. Apfel</u>, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all

impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio, 862 F.2d at 180. The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobana, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question sets precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). Thus, where an ALJ's hypotheticals include all of a claimant's impairments as supported by the record, and the expert limited his opinion in this regard, an ALJ properly relies on the vocational expert's testimony. Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995).

The Eighth Circuit held as follows in Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005):

> "Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir.2004) (citing Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir.1996)). The hypothetical question must include all the claimant's impairments supported by substantial evidence in the record as a whole. Id. (citing Pickney v. Chater, 96 F.3d 294, 296 (8th Cir.1996)). *However, the hypothetical question need only include those impairments which the ALJ accepts as true.* Rappoport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir.1991).

Where a vocational expert, in response to a hypothetical which captures the concrete consequences of a claimant's deficiencies, responds that there are readily available jobs in which the claimant can engage, the Commissioner has met his burden to demonstrate the claimant's ability to

work in the economy. Cox v. Astrue, 495 F.3d 614, 621 (8th Cir. 2007) (citing Reed v. Sullivan, 988 F.2d 812, 815-16 (8th Cir. 1993)).

In the matter under consideration, after considering the medical evidence and after considering Plaintiff's credibility, the ALJ found that Plaintiff has the following RFC: Plaintiff can "perform the physical exertional and nonexertional requirements of work except for lifting more than 10 pounds frequently or more than 20 pounds occasionally, or having concentrated or excessive exposure to temperature extremes. There are no credible, medically-established mental or other nonexertional limitations." Tr. 21. In particular, the ALJ found not credible Plaintiff's allegations of impairments producing symptoms and limitations or sufficient severity to prevent the performance of all sustained work. The court has found above that the ALJ's conclusions regarding Plaintiff's credibility, including his consideration of Plaintiff's medical records, are supported by substantial evidence. Further, the court finds that the ALJ's determination of Plaintiff's RFC is based on substantial evidence.

Pursuant to the Regulations and case law, the ALJ considered the demands of Plaintiff's past relevant work as explained by the VE and further considered whether a person with Plaintiff's RFC can perform this work. See 20 C.F.R. § § 404.1520(e)-(f), 404.1560; Evans, 21 F.3d at 832. First, the ALJ relied on the VE's testimony that Plaintiff's past relevant work as a factory laborer, as she performed it, was sedentary and unskilled; that her past relevant work in a retail stock position was unskilled and light; and that her past relevant work in a school janitorial position was light to medium and unskilled. Next, the ALJ properly posed a hypothetical to the VE which hypothetical included those impairments which the ALJ found credible. See Grissom, 416 F.3d at 836; Gilbert, 175 F.3d at 604; Haggard, 175 F.3d at 595; Sobania, 879 F.2d at 445. The ALJ then relied on the VE's testimony that a person with the RFC which the ALJ assigned to Plaintiff can perform the retail stock position and the factory laborer position and, in some settings, the janitorial position. As such, the ALJ found that Plaintiff's

past relevant work as a factory worker did not require performance of tasks precluded by her RFC; that she can perform her past relevant work; and that, therefore, she is not disabled. Because the hypothetical posed to the VE included those impairments which the ALJ found credible, this properly phrased hypothetical constitutes substantial evidence. See Grissom, 416 F.3d at 836. For the reasons articulated above, the court finds that the ALJ's finding that Plaintiff can perform her past relevant work is supported by substantial evidence on the record and is consistent with the Regulations and case law. 20 C.F.R. § § 404.1520(e)-(f), 404.1560. See also Roe v. Chater, 92 F.3d 672, 676 (8th Cir. 1996) (holding that the ALJ properly described the claimant's RFC to the VE and asked whether this level of impairment precluded the claimant's performing his pervious jobs).

Because the ALJ found that Plaintiff can perform her past relevant work he was not required to proceed further with the analysis. See 20 C.F.R. § 404.1520(e)-(f). Alternatively, the ALJ considered that Plaintiff's job as a factory worker was not relevant as past work because it was remote in history. Consistent with 20 C.F.R. § 404.1560(c)(1), the ALJ posed a hypothetical to the VE using the same RFC assessment he used to decide if she could perform her past relevant work. Based on this hypothetical, the VE testified that there were 15,000 light jobs, all light exertion, and 2025 sedentary jobs, all unskilled, which a person with Plaintiff's RFC could perform. As stated above, consistent with the Regulations and case law, the ALJ included in this hypothetical only those limitations which he found credible. See Grissom, 416 F.3d at 836; Gilbert, 175 F.3d at 604; Haggard, 175 F.3d at 595; Sobania, 879 F.2d at 445. The hypothetical factors which Plaintiff contends the ALJ ignored were not limitations which the ALJ found credible; as such, the ALJ was not required to include these limitations in a hypothetical to the VE. The court finds, therefore, that the hypotheticals which the ALJ posed to the VE are supported by substantial evidence and that the ALJ's decision in this regard is consistent with the case law and Regulations. The court further finds that the ALJ properly considered the

testimony of the VE that Plaintiff is able to perform other work which is available in the economy. In summation, the court finds that the decision of the ALJ in regard to Plaintiff's RFC, in regard to her ability to perform her past relevant work, in regard the availability of other work which she can perform, and in regard to the conclusion that Plaintiff is not disabled is supported by substantial evidence.

## VI.
## CONCLUSION

For the reasons more fully set forth above, the court finds that the ALJ's decision is supported by substantial evidence contained in the record as a whole, and that, therefore, the Commissioner's decision should be affirmed.

**ACCORDINGLY,**

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in the Complaint be **DENIED** and that Judgment be entered in favor of Defendant; Doc. 1

The parties are advised that they have eleven (11) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
Dated this 6th day of March, 2009.                    UNITED STATES MAGISTRATE JUDGE